IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

_____

No. 18-0845

_____

FILED

**May 17, 2019**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE: N.H., C.H., and B.H.

_____

Appeal from the Circuit Court of Jackson County
Honorable Lora A. Dyer, Judge
Civil Action Nos. 16-JA-22, 16-JA-23, and 16-7A-24

AFFIRMED AND REMANDED WITH DIRECTIONS
_____

Submitted: April 24, 2019
Filed: May 17, 2019

Lauren A. Estep, Esq.
Public Defender Corporation
Ripley, West Virginia
Attorney for Petitioner C.R.

Patrick Morrisey, Esq.
Attorney General
Charleston, West Virginia
Lee Niezgoda, Esq.
Assistant Attorney General
Fairmont, West Virginia
Attorneys for Respondent DHHR

Erica Brannon Gunn, Esq.
Spencer, West Virginia
Guardian ad litem

JUSTICE HUTCHISON delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.      "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children."  Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996).

2.      "'In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided.' Syl. Pt. 1, *State ex rel. Cash v. Lively*, 155 W.Va. 801, 187 S.E.2d 601 (1972)."  Syl. Pt. 4, *In re J.S.*, 233 W.Va. 394, 758 S.E.2d 747 (2014).

3.      "At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child."  Syl. Pt. 6, *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991).

4.      "In making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that

i

governs any dispositional decision remains the best interests of the child." Syl. Pt. 4, *In re B.H.*, 233 W.Va. 57, 754 S.E.2d 743 (2014).

5. "[C]ourts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened[.]" Syl. Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

6. "Where there has been a prior involuntary termination of parental rights to a sibling, the issue of whether the parent has remedied the problems which led to the prior involuntary termination sufficient to parent a subsequently-born child must, at minimum, be reviewed by a court, and such review should be initiated on a petition pursuant to the provisions governing the procedure in cases of child neglect or abuse set forth in West Virginia Code §§ 49–6–1 to –12 (1998) [now West Virginia Code § 49-4-601 to -610]. Although the requirement that such a petition be filed does not mandate termination in all circumstances, the legislature has reduced the minimum threshold of evidence necessary for termination where one of the factors outlined in West Virginia Code § 49–6–5b(a) (1998) [now West Virginia Code § 49-4-605(a) (2015)] is present." Syl. Pt. 2, *In the Matter of George Glen B., Jr.*, 205 W.Va. 435, 518 S.E.2d 863 (1999).

7. "In civil abuse and neglect cases, the legislature has made DHHR the State's representative. In litigations that are conducted under State civil abuse and neglect

statutes, DHHR is the client of county prosecutors. The legislature has specifically indicated through W.Va. Code § 49–6–10 (1996) [now W.Va. Code § 49-4-502 (2015)] that prosecutors must *cooperate* with DHHR's efforts to pursue civil abuse and neglect actions. The relationship between DHHR and county prosecutors under the statute is a pure attorney-client relationship. The legislature has not given authority to county prosecutors to litigate civil abuse and neglect actions independent of DHHR. Such authority is granted to prosecutors only under State criminal abuse and neglect statutes. Therefore, all of the legal and ethical principles that govern the attorney-client relationship in general, are applicable to the relationship that exists between DHHR and county prosecutors in civil abuse and neglect proceedings." Syl. Pt. 4, *State ex rel. Diva P. v. Kaufman*, 200 W.Va. 555, 490 S.E.2d 642 (1997).

8. "In cases involving the abuse and neglect of children, when it appears from this Court's review of the record on appeal that the health and welfare of a child may be at risk as a result of the child's custodial placement, regardless of whether that placement is an issue raised in the appeal, this Court will take such action as it deems appropriate and necessary to protect that child." Syl. Pt. 6, *In re Timber M.*, 231 W.Va. 44, 743 S.E.2d 353 (2013).

9. "When an abuse and neglect petition is brought based solely upon a previous involuntary termination of parental rights to a sibling pursuant to West Virginia Code § [49-4-605(a)(3) (2015)], prior to the lower court's making any disposition

regarding the petition, it must allow the development of evidence surrounding the prior involuntary termination(s) and what actions, if any, the parent(s) have taken to remedy the circumstances which led to the prior termination(s)." Syl. Pt. 4, *In the Matter of George Glen B., Jr.*, 205 W.Va. 435, 518 S.E.2d 863 (1999).

10.    "'Prior acts of violence, physical abuse, or emotional abuse toward other children are relevant in a termination of parental rights proceeding, are not violative of W.Va.R.Evid. 404(b), and a decision regarding the admissibility thereof shall be within the sound discretion of the trial court.' Syl. Pt. 8, *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991)." Syl. Pt. 3, *In the Matter of George Glen B., Jr.*, 205 W.Va. 435, 518 S.E.2d 863 (1999).

**HUTCHISON, Justice:**

The petitioner, C.R.,[1] appeals the August 29, 2018, disposition order of the Circuit Court of Jackson County terminating her parental rights to her three oldest children, N.H., C.H., and B.H. In this appeal, the petitioner contends that the circuit court erred by finding that it was contrary to the best interests of the children to be returned to her custody even though she successfully completed her post-adjudicatory improvement period. Both respondents, the West Virginia Department of Health and Human Resources ("DHHR") and the guardian ad litem, maintain that termination of the petitioner's parental rights was warranted despite her compliance with the services provided during her improvement period.

Upon consideration of the parties' briefs and oral arguments, the submitted appendix record, and the pertinent authorities, we find no error. Accordingly, for the reasons set forth below, the circuit court's disposition order terminating the petitioner's parental rights to N.H., C.H., and B.H. is affirmed. However, we remand this case to the circuit court for further proceedings because the record indicates that the petitioner gave birth to a fourth child shortly before the disposition order was entered by the circuit court. As discussed below, when a child is born to a parent whose parental rights to another child

---

[1] As in all cases involving sensitive facts and minor children, we use initials to identify the parties. *See* W.Va. R. App. Proc. 40(e); *see also State v. Edward Charles L.*, 183 W.Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

1

have been previously terminated, our statutory and case law require the circuit court to determine whether the problems that led to the prior involuntary termination have been sufficiently remedied or whether the parental rights to the subsequently-born child should be terminated.

## I. Facts and Procedural Background

When the DHHR initiated this abuse and neglect proceeding in March 2016, N.H., C.H., and B.H. were living with the petitioner and her boyfriend, M.L.[2] In the abuse and neglect petition, the DHHR alleged that the children's health and safety were at imminent risk because of the petitioner's illegal drug use and their exposure to domestic violence between the petitioner and M.L. Specifically, the petition indicated that N.H., the oldest child,[3] had disclosed that her mother "has 'chill pills' to help her calm down" and that her mother "mostly just sleeps forever." The DHHR asserted that the petitioner's drug use was causing her to neglect the psychological treatment and education of her children, particularly that of C.H., who is autistic, by, among other things, not providing the school with the requisite medical documentation so that proper education services could be

---

[2]M.L. is not the biological father of the children, but he was made a respondent in the proceeding below and the abuse and neglect petition was amended to include his four biological children from a prior relationship. The biological fathers of N.H., C.H., and B.H. were also made respondents, and their parental rights to their respective children were terminated. M.L., M.L's children, and the biological fathers of N.H., C.H., and B.H. are not parties in this appeal.

[3]When the petition was filed, the children were seven, five, and four years old.

provided. The petition further asserted that the petitioner had not been present to meet her children at the bus stop on multiple occasions, necessitating their return to school until they were picked up by a parent or guardian. In one instance, the petitioner could not be located, and an aunt had to come and get the children.

With respect to the domestic violence allegations, the petition stated that the children had disclosed that M.L. broke the television and a vase during arguments with their mother. N.H. reported that the petitioner told her that "[M.L.] is going to burn us" and that she attempted to break up the fights by "trying to talk [M.L.] out of beating up her mother" or screaming to alert someone when she was unsuccessful. B.H. reported that "[M.L.] told his mommy that he was going to kill her." Upon the filing of the abuse and neglect petition, the children were removed from the home and placed in foster care.

The petitioner waived her right to a preliminary hearing and, subsequently, stipulated to the allegations set forth in the petition. The petitioner admitted that "she has a drug abuse issue which has negatively impacted her parenting[.]" She further acknowledged that there had been domestic violence in the home while the children were present. Upon the court's acceptance of the stipulated adjudication, the petitioner filed a motion for a post-adjudicatory improvement period, which was granted on August 8, 2016.

Thereafter, the court granted the petitioner a three-month extension so she could complete an Intensive Outpatient Program ("IOP") for her drug addiction.[4]

Following multiple review hearings, the circuit court entered an order April 11, 2018, regarding the petitioner's completion of her post-adjudicatory improvement period.[5] In that order, the circuit court concluded that

> [t]he weight of the evidence demonstrates [the petitioner] has substantially complied with the terms and conditions of her improvement period;[6] the only evidence suggesting deficient compliance is [the petitioner] having remained on Subutex,[7] but she rebutted such by presenting reliable testimony that she did so only at the direction of her physician.

---

[4]It was later determined that the petitioner did not qualify for an IOP because she did not meet the addiction qualifications. Instead, she participated in relapse prevention classes and counseling, which were approved by the multidisciplinary team.

[5]The order indicates that hearings regarding the petitioner's completion of her improvement period were held on December 4, 2017, December 15, 2017, and February 16, 2018. Transcripts of those hearings were not included in the appendix record submitted with this appeal.

[6]During her improvement period, the petitioner was required to undergo a parental fitness evaluation and follow the recommendations of such evaluation; undergo a substance abuse evaluation; complete a drug abuse rehabilitation program; participate in victim's impact counseling; participate in parenting and adult life skills classes; submit to random drug screening; and participate in supervised visitation with her children.

[7]While the circuit court indicated that the petitioner was taking Subutex, the medication is referred to as Suboxone in other instances in the record. As this Court has previously noted, "[b]oth of these medications are used to wean persons addicted to [narcotics] and to lessen withdrawal symptoms . . . . *See generally* Drug Identification Bible 2014/2015 Edition 881 (2014/2015) (describing both 'Subutex' and 'Suboxone' as the '[b]rand names for a Schedule III medication used to treat narcotic addiction')." *In re A.L.C.M.*, 239 W.Va. 382, 386 n.7, 801 S.E.2d 260, 264 n. 7 (2017).

(Footnotes added). With regard to the petitioner's continued use of Subutex, the order indicated that the petitioner tried to stop taking the medication in June 2017. However, she was pregnant at the time with her fourth child and was hospitalized for nausea and vomiting caused by her withdrawal from the medication. According to the circuit court's order, the petitioner's obstetrician testified that it was safer for her to continue to take the Subutex during her pregnancy so he referred her to a clinic that provided a step-down regime to have her off the medication within a year. At the final improvement period review hearing, the petitioner testified that she was still taking Subutex but indicated she expected to be weaned from the medication soon.

Thereafter, the circuit court scheduled the final disposition hearing, and the DHHR filed a motion to terminate the petitioner's parental rights. Disposition hearings were held on July 5, and July 13, 2018.[8] On August 29, 2018, the circuit court entered the disposition order terminating the petitioner's parental rights to N.H., C.H., and B.H., setting forth the following findings:

> The Court has heard evidence herein of the [] children's need for substantial ongoing care from various providers: [C.H.] is a non-verbal, autistic child, requiring much care, close supervision, and frequent medical and therapeutic appointments. [B.H.] suffers from both serious behavioral issues and health problems which have necessitated trips to medical providers all over the State. [N.H.] suffers from anxiety and depression, which require counseling and psychiatric care. Contrary to the needs of her children, [the petitioner] has not acquired a driver's license during the

---

[8]Transcripts of the disposition hearings were not included in the appendix record.

5

pendency of this case, and still relies on others for transportation. Furthermore, despite the children's need for medical treatment and care, [the petitioner] made no attempt[] to attend any such appointments during this case, nor did she call the [DHHR] to check on the welfare of her children. And despite [the petitioner's] stated desire to reclaim custody of her children, by her own testimony, [the petitioner] has made no attempt to acquire any knowledge of the specific physical maladies which afflict her children, in spite of the [DHHR's] resources that have been made available to her for that purpose. In short, [the petitioner] has not taken advantage of the significant amount of time afforded to demonstrate a willingness to meet the needs of these children.

Also, the children continue to display a fear of and a desire to have no contact with [M.L.] with whom [the petitioner] maintains an ongoing relationship. Although the Court recognizes the unquestioned right of an individual to pursue such a relationship, the Court observes [the petitioner] has chosen to pursue her relationship with [M.L.] such that she has been hindered in correcting the conditions of abuse and neglect at issue in this case.

Upon entry of the disposition order, the petitioner filed this appeal.

## II. Standard of Review

Our standard of review for abuse and neglect cases is well established. In syllabus point one of *In the Interest of Tiffany Marie S.*, 196 W.Va 223, 470 S.E.2d 177 (1996), this Court held:

Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when,

6

although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

With this standard in mind, we consider the parties' arguments.

## III.  Discussion

### A.  N.H., C.H., and B.H.

In this appeal, the petitioner argues that because she successfully completed her improvement period, the circuit court erred by not finding that it was in the children's best interests to be returned to her custody.  According to the petitioner, the only concern expressed by CPS worker Morgan Perrine at the disposition hearing pertained to her continued use of Subutex.  However, Ms. Perrine acknowledged that the petitioner never failed a drug screen during the pendency of the proceeding and that she had been directed by her physician to slowly wean from the Subutex because of her pregnancy and subsequent breastfeeding of her newborn.  With respect to the domestic violence, the petitioner points out that M.L. underwent counseling and anger management training during the proceeding and successfully completed his improvement period such that his custodial visitation arrangement he had with his biological children was restored.[9]

_____

[9] During oral argument, the DHHR noted that rather than completing the usual thirty-week program for anger management, M.L. only completed a two-week online course.

7

Therefore, the petitioner maintains that there was no clear and convincing evidence that that it would be unsafe to return her children to her custody.

Conversely, the DHHR and guardian ad litem argue that termination of petitioner's parental rights was warranted despite her compliance with services during her post-adjudicatory improvement period because she failed to change her overall attitude and approach to parenting, which was necessary for reunification with her children. In that regard, the respondents point out that the evidence established that the children were still traumatized by the domestic violence they witnessed and remained afraid of M.L. Yet, the petitioner continued her relationship with M.L., became pregnant, and gave birth to his child during the course of this proceeding. The respondents contend that the petitioner's lack of insight into how her relationship with M.L. has affected her children shows that she failed to change her overall attitude and approach to parenting. The respondents further argue that the petitioner failed to make the necessary changes with regard to her substance abuse because she was still using Suboxone at the time of the final disposition hearing, reflecting her failure to understand the urgency to become drug free so that her children could be safely returned to her care. Finally, the respondents argue that the petitioner failed to make meaningful changes to show that she has the ability to provide proper care for her children given their special needs. They note that the petitioner remained disengaged and disinterested in the special needs of her children throughout the proceeding below, never asking to attend any of their medical appointments or even expressing concern when she was told that one of her children could possibly have a brain tumor. In sum, the respondents

8

maintain that the circuit court properly determined, based upon all the evidence, that the best interests of the children necessitated the termination of the petitioner's parental rights.[10]

It has long been established that "although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996). Indeed, "'[i]n a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided.' Syl. Pt. 1, *State ex rel. Cash v. Lively*, 155 W.Va. 801, 187 S.E.2d 601 (1972)." Syl. Pt. 4, *In re J.S.*, 233 W.Va. 394, 758 S.E.2d 747 (2014). Accordingly, this Court has held that

> [a]t the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and *whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.*

---

[10]The guardian ad litem also notes that this is a not a case where additional time for improvement could be granted because the children had been in foster care for twenty-seven months at the time of the disposition hearing, exceeding the statutory time frame for improvement periods. *See* W.Va. Code § 49-4-610(9) (2015) (setting time limit for improvement periods to preclude child from being in foster care more than fifteen months of last twenty-two months absent compelling circumstances).

Syl. Pt. 6, *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991) (emphasis added).  As

we have explained, "the ultimate goal [of an improvement period] is restoration of a stable

family environment, not simply meeting the requirements of the case plan."  *W.Va. Dep't*

*of Human Serv. v. Peggy F.*, 184 W.Va. 60, 64, 399 S.E.2d 460, 464 (1990).  Consequently,

> [t]he question at the dispositional phase of a child abuse
> and neglect proceeding is not simply whether the parent has
> successfully completed his or her assigned tasks during the
> improvement period. Rather, the pivotal question is what
> disposition is consistent with the best interests of the child.

*In re Francis J.A.S.*, 213 W.Va. 636, 646, 584 S.E.2d 492, 502 (2003).  In other words,

> [i]n making the final disposition in a child abuse and
> neglect proceeding, the level of a parent's compliance with the
> terms and conditions of an improvement period is just one
> factor to be considered. The controlling standard that governs
> any dispositional decision remains the best interests of the
> child.

Syl. Pt. 4, *In re B.H.*, 233 W.Va. 57, 754 S.E.2d 743 (2014).


In this case, the circuit court found that although the petitioner had

substantially complied with the terms and conditions of her improvement period, she still

"demonstrated an inadequate capacity to solve the problems of abuse and neglect" and that

reunification was not in the best interests of the children.  Upon review of the record, we

find that the evidence supports the circuit court's findings.  Despite the improvement

period, the petitioner failed to demonstrate a willingness to meet the needs of her children

and the ability to correct the conditions of abuse and neglect.  In particular, the petitioner

made no attempt to educate herself about her children's medical and psychological

10

diagnoses and never obtained a driver's license so that she could take them to their doctors' appointments. The final order indicates that during the disposition hearing, the petitioner was asked what she had learned about autism since the beginning of the proceeding. She replied, "During this case, nothing." When asked why she had not taken any steps to prepare herself to maintain the level of care her children had received during the pendency of this case, the petitioner said, "I guess, I never really thought about it."

It is also evident that the petitioner failed to understand her children's fear of M.L. and desire to have no further contact with him. According to the record, the children were too afraid to participate in family counseling with M.L. during the improvement period. In addition, N.H. testified[11] that she was afraid that if she went home she would get hurt. She also stated that she was did not think her brother and sister would be safe, either. [12] Referring to M.L., N.H. explained that "he beat my mom up and I always got in the middle of it and I didn't [sic] want to go back there, because I'm afraid it's going to happen again." When asked what M.L. did to her mommy, N.H. replied, "punch[ed] her in the face and choke[d] her." When asked if she ever got hurt, N.H., testified, "Almost . .

---

[11] Prior to disposition, the circuit court received in camera testimony from N.H. As this Court has explained, "[c]ases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren) . . . and [therefore, the children's] own feelings and emotional attachments should be taken into consideration by the lower court." *In the Matter of Brian D.*, 194 W.Va. 623, 636, 461 S.E.2d 129, 142 (1995).

[12] According to the guardian ad litem, N.H. has also expressed concern for the safety of the baby, i.e., the petitioner's fourth child who was born during course of this case.

. when I was trying to get them away from each other I almost got punched [by M.L.]." Although the petitioner was aware of her children's fear of M.L. and indicated at the beginning of the case that she would end her relationship with M.L. so her children could be returned to her custody, she did not do so. Instead, she pursued her relationship with M.L. and gave birth to his child while this case was pending before the circuit court.

In sum, while the record shows the petitioner made some changes in order to comply with the requirements of her case plan, it also reflects that the petitioner did not modify her behavior to correct the conditions of abuse and neglect. "We have recognized that it is possible for an individual to show compliance with specific aspects of the case plan while failing to improve . . . [the] overall attitude and approach to parenting." *In re B.H.,* 233 W.Va. at 65, 754 S.E.2d at 751 (additional quotations and citations omitted). Such is the case here. Simply put, in the context of all the circumstances, the petitioner failed to make sufficient improvement to justify the return of her children. *See Carlita B.,* 185 W.Va. at 616, 408 S.E.2d at 368, syl. pt. 6. This Court has explained, "[i]n the difficult balance which must be fashioned between the rights of the parent and the welfare of the child[ren], the paramount and controlling factor must be the child[ren]'s welfare." *Id.* at 629, 408 S.E.2d at 381. To that end, "courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened[.]" Syl. Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980). Accordingly, for the reasons set forth above, we affirm

12

the circuit court's August 29, 2018, disposition order terminating the petitioner's parental rights to her three oldest children.

In light of our decision affirming the termination of the petitioner's parental rights to N.H., C.H., and B.H., the DHHR must make every effort to obtain permanency for these children as soon as possible. According to the status updates filed with this Court pursuant to Rule 11(j) of the Rules of Appellate Procedure, the children are currently residing in three separate foster homes in close proximity to one another, and each foster family has expressed a willingness to adopt the child placed in their care and to facilitate visitation between children. Given that these children have been in foster care for more than three years, the need for each child to have a stable and permanent home cannot be overstated.

Rule 39(b) of the Rules of Procedure for Child and Abuse and Neglect Proceedings requires:

> At least once every three months until permanent placement is achieved as defined in Rule 6, the court shall conduct a permanent placement review conference, requiring the multidisciplinary treatment team to attend and report as to progress and development in the case, for the purpose of reviewing the progress in the permanent placement of the child.

Moreover, permanent placement for the children must occur within twelve months of the date of the disposition order. As this Court has held:

[t]he [twelve]-month period provided in Rule 43 of the West Virginia Rules of Procedures for Child Abuse and Neglect Proceedings for permanent placement of an abused and neglected child following the final dispositional order must be strictly followed except in the most extraordinary circumstances which are fully substantiated in the record.

Syl. Pt. 6, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

It is well established that "an adoptive home is the preferred permanent out-of-home placement." Syl. Pt. 2, in part, *State v. Michael M.*, 202 W.Va. 350, 504 S.E.2d 177 (1998). Consequently,

[i]n determining the appropriate permanent out-of-home placement of a child under [West Virginia Code § 49-4-604(b)(6) (2015)], the circuit court shall give priority to securing a suitable adoptive home for the child and shall consider other placement alternatives, including permanent foster care, only where the court finds that adoption would not provide custody, care, commitment, nurturing and discipline consistent with the child's best interests or where a suitable adoptive home can not be found.

*Id.* at 352, 504 S.E.2d at 179, syl. pt. 3. Obviously, "[t]he guardian ad litem's role in abuse and neglect proceedings does not actually cease until such time as the child is placed in a permanent home." Syl. Pt. 5, *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991).

### B. Petitioner's Fourth Child

As noted above, the petitioner gave birth to another child during the pendency of this case. However, that child was not included in the proceeding below.

14

While no party assigned any error in that regard, we cannot ignore the fact that this child is now living in the same household from which N.H., C.H., and B.H. were removed. This Court has made clear that

> [w]here there has been a prior involuntary termination of parental rights to a sibling, the issue of whether the parent has remedied the problems which led to the prior involuntary termination sufficient to parent a subsequently-born child must, at minimum, be reviewed by a court, and such review should be initiated on a petition pursuant to the provisions governing the procedure in cases of child neglect or abuse set forth in West Virginia Code §§ 49–6–1 to –12 (1998) [now West Virginia Code § 49-4-601 to -610]. Although the requirement that such a petition be filed does not mandate termination in all circumstances, the legislature has reduced the minimum threshold of evidence necessary for termination where one of the factors outlined in West Virginia Code § 49–6–5b(a) (1998) [now West Virginia Code § 49-4-605(a) (2015)] is present.

Syl. Pt. 2, *In the Matter of George Glen B., Jr.*, 205 W.Va. 435, 518 S.E.2d 863 (1999); *see also* W.Va. Code § 49-4-605(a)(3) (2015) (requiring DHHR to file abuse and neglect petition when "the parental rights of the parent to another child have been terminated involuntarily").

Given the record in this case, we find it extremely troubling that no action was taken after the fourth child was born to amend the abuse and neglect petition to include that child in the proceeding below, nor was any petition filed with regard to that child after the disposition order was entered by the circuit court. During oral argument in this case, the DHHR indicated that although it requested that the petition be amended, the county prosecutor declined to do so. This Court has made it abundantly clear that prosecuting

15

attorneys must *fully and promptly cooperate* with the DHHR as mandated by West Virginia

Code § 49-4-502 (2015).  That statute provides:

> It is the duty of every prosecuting attorney to cooperate fully and promptly with persons seeking to apply for relief, including copetitioners with the department, under this article in all cases of suspected child abuse and neglect; to promptly prepare applications and petitions for relief requested by those persons, to investigate reported cases of suspected child abuse and neglect for possible criminal activity; and to report at least annually to the grand jury regarding the discharge of his or her duties with respect thereto.

*Id.*  Accordingly, this Court has held:

> [i]n civil abuse and neglect cases, the legislature has made DHHR the State's representative. In litigations that are conducted under State civil abuse and neglect statutes, DHHR is the client of county prosecutors. The legislature has specifically indicated through W.Va. Code § 49-6-10 (1996) [now W.Va. Code § 49-4-502 (2015)] that prosecutors must *cooperate* with DHHR's efforts to pursue civil abuse and neglect actions. The relationship between DHHR and county prosecutors under the statute is a pure attorney-client relationship. The legislature has not given authority to county prosecutors to litigate civil abuse and neglect actions independent of DHHR. Such authority is granted to prosecutors only under State criminal abuse and neglect statutes. Therefore, all of the legal and ethical principles that govern the attorney-client relationship in general, are applicable to the relationship that exists between DHHR and county prosecutors in civil abuse and neglect proceedings.

Syl. Pt. 4, *State ex rel. Diva P. v. Kaufman*, 200 W.Va. 555, 490 S.E.2d 642 (1997).   In

other words, "prosecutors [are not] statutorily entrusted with independent enforcement of

civil abuse and neglect proceedings.  To the contrary . . . the State ha[s] reposed that

responsibility upon the DHHR."  *Id.* at 565, 490 S.E.2d at 652.  *See also In re Ashton M.*,

228 W.Va. 584, 589, 723 S.E.2d 409, 414 (2012) (observing that prosecuting attorney had

16

duty to convey DHHR's recommendation in abuse and neglect proceeding to the court because of attorney-client relationship). Thus, in this case, the prosecutor should have complied with the DHHR's request and amended the abuse and neglect petition to include the petitioner's fourth child in the proceeding below.

Because an abuse and neglect petition has not been filed with respect to the petitioner's fourth child despite the statutory and case law requirements, we are remanding this case to the circuit court for further proceedings in that regard. As we have held,

> [i]n cases involving the abuse and neglect of children, when it appears from this Court's review of the record on appeal that the health and welfare of a child may be at risk as a result of the child's custodial placement, regardless of whether that placement is an issue raised in the appeal, this Court will take such action as it deems appropriate and necessary to protect that child.

Syl. Pt. 6, *In re Timber M.*, 231 W.Va. 44, 743 S.E.2d 353 (2013); s*ee also In re A.N.,* 241 W.Va. 275, 823 S.E.2d 713 (2019) (remanding for re-evaluation of appropriateness of allowing father to retain custody of his son where father's parental rights to his daughter were terminated). Upon remand, the circuit court shall order the State to immediately file an abuse and neglect petition with respect to the petitioner's fourth child in accordance with West Virginia Code § 49-4-605(a)(3).

In remanding this case, we take no position with regard to the ultimate resolution as to petitioner's fourth child. Syllabus point four of *In re George B*. holds:

17

When an abuse and neglect petition is brought based solely upon a previous involuntary termination of parental rights to a sibling pursuant to West Virginia Code § [49-4-605(a)(3) (2015)], prior to the lower court's making any disposition regarding the petition, it must allow the development of evidence surrounding the prior involuntary termination(s) and what actions, if any, the parent(s) have taken to remedy the circumstances which led to the prior termination(s).

*Id.* at 437, 518 S.E.2d at 865, syl. pt. 4. However, the circuit court should be mindful that

"[p]rior acts of violence, physical abuse, or emotional abuse toward other children are relevant in a termination of parental rights proceeding, are not violative of W.Va. R. Evid. 404(b), and a decision regarding the admissibility thereof shall be within the sound discretion of the trial court." Syl. Pt. 8, *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991).

*In re George B.*, 205 W.Va. at 437, 518 S.E.2d at 865, syl. pt. 3.


## IV. Conclusion

Accordingly, for the reasons set forth above, the disposition order entered on August 29, 2018, terminating the petitioner's parental rights to N.H., C.H., and B.H. is affirmed, and this case is remanded to the circuit court for further proceedings consistent with this opinion, including the immediate filing of an abuse and neglect petition as set forth herein. The Clerk is directed to issue the mandate forthwith.

Affirmed and remanded with directions.